1

2

3

4                            UNITED STATES DISTRICT COURT

5                          NORTHERN DISTRICT OF CALIFORNIA

6                                   SAN JOSE DIVISION

7

8      KJ-PARK, LLC,                              Case No.  23-cv-02346-VKD

9                     Plaintiff,                  **ORDER RE PARTIES' MOTIONS FOR
                                                  SUMMARY JUDGMENT AND
10            v.                                  DENYING AS MOOT CERTAIN
                                                  MOTIONS TO EXCLUDE EXPERT
11     MATCH GROUP, LLC, et al.,                  TESTIMONY**

12                    Defendants.                 Re: Dkt. Nos. 97, 99, 100, 104

13

14            This federal diversity action arises out of a commercial lease agreement for a three-story

15     building located at 2555 Park Boulevard in the City of Palo Alto, California ("City").[1]  Plaintiff

16     KJ-Park, LLC ("KJ-Park") claims that defendants Match Group, LLC and Match Group, Inc.

17     (collectively, "defendants" or "Match Group") breached the lease agreement and a guaranty, and

18     owe KJ-Park at least $6,986,605 in damages, plus additional unpaid rent.  *See* Dkt. No. 72.  The

19     key disputed issue is whether Match Group properly terminated the lease agreement.

20            KJ-Park now moves for partial summary judgment on its claims and on Match Group's

21     affirmative defenses of mistake, fraud in the inducement, illegal purpose, and frustration of

22     purpose.  KJ-Park principally contends that it obtained a "vested legal right" to use the entire

23     three-story building as an office well before the parties entered into the lease agreement,

24     regardless of any position to the contrary asserted by the City, and that Match Group therefore had

25     no right to terminate the lease agreement on the basis that KJ-Park failed to deliver premises that

26

27     ───────────────────
       [1] All parties have expressly consented that all proceedings in this matter may be heard and finally
28     adjudicated by a magistrate judge.  28 U.S.C. § 636(c); Fed. R. Civ. P. 73; Dkt. Nos. 8, 11.

1    complied with the City's retail ordinance.  Dkt. Nos. 100, 114.  Match Group opposes KJ-Park's

2    motion for partial summary judgment.  Dkt. No. 106.

3           Match Group also moves for summary judgment in its favor on KJ-Park's claims for

4    breach of contract and breach of guaranty, as well as Match Group, LLC's counterclaims for

5    breach of contract and for monies had and received, and Match Group's affirmative defenses of

6    mistake and frustration of purpose.  Match Group contends that the City applied its retail

7    ordinance to preclude or delay approval for the lawful occupancy and use of the subject property

8    as office space on all three floors until well after KJ-Park was contractually obliged to deliver the

9    premises to Match Group.  Match Group, LLC claims that KJ-Park owes more than $300,000 for

10   rent, expenses, vendor costs, and security regarding the subject property.  Dkt. Nos. 97, 113.  KJ-

11   Park opposes Match Group's summary judgment motion.  Dkt. No. 107.

12          Upon consideration of the parties' respective moving and responding papers, as well as the

13   oral arguments presented, the Court grants in part and denies in part KJ-Park's motion for partial

14   summary judgment, and grants in part and denies in part Match Group's motion for summary

15   judgment.[2]

16   **I.     BACKGROUND**

17          Unless otherwise indicated, the following facts are undisputed.

18          In September 2013, a prior property owner submitted an application to the City for

19   permission "to [a]llow the [d]emolition of an [e]xisting 10,800 sq. ft. [t]wo-[s]tory [m]id-[c]entury

20   [m]odern [o]ffice [b]uilding and [c]onstruction of a [n]ew 24,466 sq. ft. [t]hree-[s]tory [o]ffice

21   [b]uilding," with "[o]ne [l]evel of [b]elow [g]rade [p]arking and a [r]oof [t]errace . . . [l]ocated in

22   the Community Commercial (CC(2)) [z]one [d]istrict at 2555 Park Boulevard."  Dkt. No. 101 ¶ 8,

23   Ex. F at ECF 2, 3, 4, 7, 9, 10, 12-13; Dkt. No. 101 ¶ 5, Ex. C (Reich Dep. at 26:4-11).  On October

---

24

25   [2] In view of the rulings in this order, the Court finds it unnecessary to address the parties' *Daubert* motions regarding Mr. Owyang and Mr. Fronen, who offer opinions on KJ-Park's claimed

26   damages.  Dkt. Nos. 99, 104.  Accordingly, those motions are denied as moot.  The Court will issue a separate order on Match Group's motion to exclude the testimony of Erik Schoennauer.

27   Dkt. No. 98.  As discussed in that separate order, the Court's rulings regarding Mr. Schoennauer's opinions do not change the Court's analysis or conclusions regarding the disposition of the parties'

28   summary judgment motions.

United States District Court
Northern District of California

16, 2014, after reviewing the application, the City's Architectural Review Board recommended that the City Council approve the project.  *See* Dkt. No. 101 ¶ 5, Ex. C (Reich Dep. at 30:10-31:24) & Ex. E; *see also generally id.* ¶ 3, Ex. A (Lait Dep. at 36:18-40:15).  An Environmental Impact Report was also prepared and considered.  *See* Dkt. No. 101 ¶ 8, Ex. F at ECF 95-223.

On June 1, 2015, the City Council approved a Record of Land Use Action ("RLUA") "certify[ying] the Environment Impact Report," and "approv[ing] the Architectural Review for a three story office building in the Community Commercial (CC(2)) zone district[.]"  *See* Dkt. No. 101 ¶¶ 8-10, Exs. F-H; *see also id.* ¶ 3, Ex. A (Lait Dep. at 41:3-14, 47:7-49:4, 51:5-15).  The RLUA granted a one-year term of approval, or entitlement, with respect to the project through June 1, 2016.  *Id.* ¶ 9, Ex. G at ECF 33. The RLUA stated that "[i]n the event actual construction of the project is not commenced within one year of the date of council approval, the approval shall expire and be of no further force or effect pursuant to the [City Municipal Code]."  *Id.*  Jonathan Lait, the City's current Director of Planning and Development Services,[3] testified in deposition that the RLUA documented the City's findings that the proposed project met applicable standards in the zoning code, "allows offices to be built in this building," and "authorizes the office to be located at the building," while "the land uses that go into that building would be subject to the permitted land uses of the zoning code."  Dkt. No. 101 ¶ 3, Ex. A (Lait Dep. at 52:16-23; 53:6-7, 15-16; 53:23-54:9).  While Mr. Lait further testified that the RLUA was the last discretionary approval required for "the building shell and design," the RLUA itself required the property owner to apply for a building permit.  Dkt. No. 101 ¶ 3, Ex. A (Lait Dep. at 48:9-12, 16-23); Dkt. No. 101 ¶ 9, Ex. G at 9.

The RLUA's "Conditions of Approval" include a requirement by the City's Department of Planning and Community Development that the property owner submit plans for a building permit "in substantial conformance with the plans received on October 16, 2014, except as modified to incorporate the [Conditions of Approval], and any additional conditions placed on the project by

---

[3] Mr. Lait began working for the City as the Assistant Director of Planning and Development Services in September 2014.  He became the Director of that department around February 2019; prior to his formal appointment as Director, he served in that role in an interim capacity beginning in around April 2018.  Dkt. No. 101 ¶ 3, Ex. A (Lait Dep. at 10:6-18, 12:23-13:3).

the Planning Commission, Architectural Review Board, or City Council." Dkt. No. 101 ¶ 9, Ex. G at 9. According to Mr. Lait, this section meant that "any substantial changes to the project may require additional discretionary action review," and that "the project can't change substantially from what was approved." Dkt. No. 101 ¶ 3, Ex. A (Lait Dep. at 51:19-52:8). The RLUA also contains an "Additional Conditions" provision and a separate "Standard Conditions" section, which both state, "The approved use and/or construction are subject to, and shall comply with, all applicable City ordinances and laws and regulations of other governmental agencies." Dkt. No. 101 ¶ 9, Ex. G at ECF 32, 34.

Several months later, the City Council passed Ordinance No. 5358 ("Ordinance"), which amended retail zoning regulations for the CC(2) zoning district, where the subject Park Boulevard property is located. *See* Dkt. No. 97-1 ¶ 4, Ex. 3. The Ordinance went into effect on November 26, 2015 and essentially requires retail use on the ground floor of buildings within the zoning district. *See id.*; *see also* Dkt. No. 97-1 ¶ 7, Ex. 6 (Lait Dep. at 121:18-22, 176:8-12). The Ordinance provides that "[l]awful conforming permitted uses or conditional uses operating pursuant to a conditional use permit which were existing on April 26, 1984 may remain as grandfathered uses and shall not require a conditional use permit or be subject to the provisions of [Municipal Code] Chapter 18.70 [concerning "Nonconforming Uses and Noncomplying Facilities"]." Dkt. No. 97-1 ¶ 4, Ex. 3. Otherwise, the Ordinance provides for a request for "waiver or adjustment" of the Ordinance, which would require action by the City Council:

> (a) Economic Hardship. An applicant may request that the requirements of this Ordinance be adjusted or waived only upon a showing that applying the requirements of this Ordinance would effectuate an unconstitutional taking of property or otherwise have an unconstitutional application to the property.
>
> (b) Documentation. The applicant shall bear the burden of presenting substantial evidence to support a waiver or modification request under this Section and shall set forth in detail the factual and legal basis for the claim, including all supporting technical documentation. Any request under this section shall be submitted to the Planning and Community Environment Director together with the fee specified in the municipal fee schedule and an economic analysis or other supporting documentation. A request under this section shall be acted upon by the City Council.

*Id*. at 6.

United States District Court
Northern District of California

4

KJ-Park purchased the subject property in August 2016, more than eight months after the Ordinance went into effect.  Dkt. No. 102 ¶ 2.  KJ-Park was aware of the Ordinance since at least March 2016, when the prior property owner provided KJ-Park with information about the Ordinance.  *See* Dkt. No. 97-1 ¶ 19, Ex. 18.

On May 27, 2016, about two months prior to KJ-Park's purchase of the property, the City approved a one-year extension of the RLUA for the project, giving KJ-Park until June 1, 2017 to begin construction.  *See* Dkt. No. 102 ¶ 6, Ex. 2; *see also id.* ¶ 7, Ex. 3.  The extension noted that "the original findings and conditions for this project are still applicable, as indicated in the [RLUA]."  Dkt. No. 102 ¶ 6, Ex. 2.  The record presented does not indicate whether the request for the extension referred to the Ordinance or its potential application to the subject property or project.  The City's letters confirming the extension do not contain any such language.  *See id.* ¶¶ 6, 7, Exs. 2, 3.

On November 16, 2016, the City's Planning Department advised that KJ-Park's building permit was in "ready to issue" status.  On that same day, KJ-Park paid the City $478,705.17 in development impact fees.  Dkt. No. 102 ¶ 8, Exs. 4, 5.

In January 2017, KJ-Park applied for a building permit and paid an additional $149,202.78 in permit fees.  Dkt. No. 102 ¶ 9, Ex. 6.  On January 19, 2017, the City issued a building permit for a "N[ew] W[arm] S[hell] F[or] T[hree] S[tory] C[ommercial] 23,853 S[quare] F[oot] B[uilding], A[nd] B[elow] G[rade] P[arking] S[tructure]."  *Id.*  The permit itself did not include any discussion of, or requirements for, the building's use.  *Id.*  Russell Reich, the City's project planner, testified in deposition that the term "warm shell" refers to a "building without the interior tenant spaces built out" and no "specific occupancy."  Dkt. No. 106-1, Ex. 9 (Reich Dep. at 104:15-21).  The record presented does not contain any testimony to the contrary.

On February 14, 2017, Dan Minkoff of The Minkoff Group (KJ-Park's project manager) sent an email to Mr. Reich, inquiring whether Mr. Reich "had a chance to look into the applicability of the retail ordinance that was passed after the project was approved[.]"  Dkt. No. 101 ¶ 12, Ex. J at ECF 2.  Mr. Reich responded that same day, stating that he "discussed this with Jonathan [Lait] and [Mr. Lait] does not feel that it would be reasonable to require retail on the

ground floor." *Id.*; *see also* Dkt. No. 101 ¶ 3, Ex. A (Lait Dep. at 82:18-23); Dkt. No. 101 ¶ 5, Ex. C (Reich Dep. at 65:5-21).  In deposition, Mr. Reich confirmed that he shared Mr. Lait's view on that issue.  Dkt. No. 101 ¶ 5, Ex. C (Reich Dep. at 65:19-21).

KJ-Park subsequently submitted revised plans for cosmetic changes to the building's façade, which the City's Architectural Review Board approved in April 2017.  Dkt. No. 101 ¶ 5, Ex. C (Reich Dep. at 26:19-27:21); ¶ 14, Ex. L.  KJ-Park's building plans otherwise remained the same as those approved by the RLUA.  *See id.* ¶ 14, Ex. L; *see also* Dkt. No. 103 ¶ 9, Ex. B.

On October 26, 2018, KJ-Park and Match Group, LLC executed an Office Lease ("Lease") for the subject property.  Dkt. No. 97-1 ¶ 2, Ex. 1.  Match Group, Inc. concurrently executed a Guaranty of Lease ("Guaranty") in which Match Group, Inc. guaranteed all of Match Group, LLC's obligations under the Lease.  Dkt. No. 97-1 ¶ 3, Ex. 2.

As relevant here, the Lease provided that KJ-Park would:

> construct or shall cause the construction of, at its sole cost and expense, the base, shell, and core of the Building, *which base, shell, and core shall be in compliance with Applicable Law (to the extent necessary for Tenant to obtain and retain a certificate of occupancy or its legal equivalent for the Premises for general office use)* and in compliance with Section 510 of the City of Palo Alto Code (collectively, the **"Base, Shell and Core"** and such work to be known as the **"Landlord Work"**).

Dkt. No. 97-1 ¶ 2, Ex. 1 at ECF 52 (emphasis added).  The Lease expressly provided that "[n]otwithstanding anything contained herein to the contrary, any retail or restaurant use that serves the general public is not permitted."  *Id.* at ECF 14.

The Lease was for a term of 87.5 months from the "Delivery Date," which is defined by an appended Tenant Work Letter as "[t]he date upon which Landlord delivers (or is deemed to have delivered) possession of the Premises to Tenant in Delivery Condition[.]"  *Id.* at ECF 2, 52.  The Lease further provides that "Delivery Condition" means:

> [t]he Base, Shell and Core for the Premises being in a construction-ready condition, which condition shall mean the substantial completion of the items set forth on **Schedule 1**, attached hereto, and Landlord shall have delivered to tenant an AIA Form G704 Certificate of Substantial Completion with regard to the Landlord Work, executed by the Landlord's architect and possession of the Premises in broom-clean condition and with concentrations of

1

Hazardous Materials (if any) below appropriate screening levels.

2

*Id*. at ECF 52.  As used in the Lease, the term "Applicable Laws" refers to "any law, statute,

3

ordinance or other governmental rule, code, regulation or requirement now in force or which may

4

hereafter be enacted or promulgated, including any such governmental regulations related to

5

disabled access[.]"  *Id*. at ECF 36.  With respect to the Delivery Date, section 2.3 of the Lease also

6

provided:

7

8

        2.3  <u>Delivery Date; Delayed Delivery Date</u>.  Landlord shall deliver possession of the Premises to Tenant on the Delivery Date; provided, however, that if the Delivery Date is delayed due to any acts or omissions of Tenant or any other Tenant Parties (each such delay, a **"Tenant Delay"**), then the Delivery Date shall be deemed to have occurred on the date that it would have occurred by for such Tenant Delay.  *Notwithstanding any provision of this Lease to the contrary, if the Delivery Date shall not occur on or before March 1, 2019 (which date shall be extended by the number of days of any Tenant Delays and Force Majeure), then until the Delivery Date occurs (i) the period of 3.5 calendar months set forth in Section 4 of the Summary (i.e., the Rent Abatement Period) shall be extended by an additional number of days equal to one day for each day after March 1, 2019 until the Delivery Date and (ii) Tenant shall have the right to terminate this Lease, by notice to Landlord on or before the 15th day following the Delivery Date*, whereupon this Lease shall terminate, and Landlord and Tenant shall have no further obligations or liabilities under this Lease (other than those stated in this Lease to survive the expiration date) except Landlord shall promptly return to Tenant any rent, additional rent or security paid by Tenant to Landlord.

9

10

11

12

13

14

15

16

17

18

19

*Id*. at ECF 8 (emphasis added).

20

      Match Group says that at the time defendants entered into the Lease, they had no

21

knowledge of the Ordinance.  *See* Dkt. No. 97-1 ¶ 6, Ex. 5 (Perez Dep. at 83:19-21, 84:6-7).  In

22

deposition, KJ-Park's principal, John Fong, testified that he could not recall, one way or the other,

23

whether during contract negotiations KJ-Park informed Match Group about the Ordinance.  *See*

24

Dkt. No. 97-1 ¶ 9, Ex. 8 (Fong Dep. at 90:12-18; 91:1-4).

25

      On March 20, 2019, Match Group, LLC's architect and general contractor met with the

26

City's Planning & Development Department to discuss Match Group, LLC's forthcoming

27

application for tenant improvements.  Match Group, LLC's tenant improvement plan

28

contemplated office use on all three floors of the subject property as stipulated in the Lease.  *See*

United States District Court
Northern District of California

7

Dkt. No. 97-1 ¶ 11, Ex. 10 at ECF 5-6.  At that meeting, Garrett Sauls, a City Associate Planner, noted the Ordinance as an issue for the tenant improvement application.  *See id.*

On March 28, 2019, KJ-Park obtained the City's final inspections and approvals for the base, shell, and core of the subject property.  *See* Dkt. No. 97-1, ¶ 20, Ex. 19 at ECF 3; *see also* Dkt. No. 101 ¶ 19, Ex. Q at ECF 3.

Meanwhile, Match Group, LLC experienced delay in its tenant improvement application, while Mr. Sauls and other City staff attempted to ascertain whether retail use would be required on the ground floor of the subject property.  *See* Dkt. No. 97-1, ¶ 11, Ex. 10 at ECF 1-5; *id.* ¶ 8, Ex. 7 (Sauls Dep. at 88:23-90:4; 93:1-9); *id.* ¶ 12, Ex. 11 at ECF 2; *id.* ¶ 20, Ex. 19.  KJ-Park assured Match Group that it was "working on this issue to help get this resolved ASAP," advised that KJ-Park had a meeting with City officials on April 9, 2019, and encouraged Match Group, LLC to apply for its permit, noting that "the City is quite slow and the sooner you can get in the cue [sic] the better it'll be to get your project processed and through the system."  Dkt. No. 110 ¶ 30, Ex. 21 at ECF 3.  Match Group, LLC responded that it "did submit [its] drawings for permit to get in the queue," but noted that the City required "a sizable non-refundable plan check fee to begin their review," and Match Group, LLC "did not want to submit the payment without knowing if we will be able to proceed as currently designed or not."  *Id.*

On April 11, 2019, Match Group, LLC's broker emailed Mr. Sauls and other City staff, asking "Could we submit our [tenant improvement] drawings now?  Or do we need resolution with the 1st floor retail requirement before submittal?"  Dkt. No. 97-1 ¶ 20, Ex. 19 at ECF 8.  Mr. Sauls responded, "I would not recommend that you resubmit your plans until we can get clarification about the retail requirements for the space," noting that he would "check in with the Director [Jonathan Lait] to see what is going on with the project."  *Id.*  In an email to Match Group, LLC's broker later that day, Mr. Sauls confirmed, "The director agrees that you should wait until the issue is addressed.  They are looking to close the loop on the conversations with the City manager and City attorney's office soon[.]  At that point, we will all know what the direction will be."  *Id.* at ECF 2.

Mr. Fong testified in deposition that around mid-May 2019, the parties and their

representatives held a "big all-hands" conference call, during which he recalls they discussed "[g]enerally that progress is being made with the [C]ity and that a resolution should be coming soon." Dkt. No. 116 ¶ 4, Ex. B (Fong Dep. at 185:16-187:23); *see also id*. ¶ 5, Ex. C.  Notes from a Match Group internal "Real Estate Update" meeting state "Update 5/24/19:  (1) Hopeful for decision from City post Memorial Day wkd."  *Id*. ¶ 3, Ex. A at ECF 6.

Match Group says that after waiting more than two months without confirmation from the City whether the subject property could be used as office space on all three floors (and no retail use), Match Group terminated the Lease on May 30, 2019.  Match Group's termination letter to KJ-Park stated that defendants were terminating the Lease, effective immediately, pursuant to Section 2.3 of the Lease.  Dkt. No. 97-1 ¶ 18, Ex. 17.  The termination letter further explained, in relevant part:

> In order for the Delivery Date and, therefore, the Lease Commencement Date, to occur (1) the Base, Shell and Core must be in compliance with all Applicable Law to the extent necessary for us to obtain a certificate of occupancy for the Premises for general office use and (2) you must have delivered to us possession of the Premises in that condition.
>
> The undisputed facts are that . . .  as of today's date, you have not placed the Base, Shell and Core in the condition for us to obtain a certificate of occupancy for the Premises for general office use, evidenced by the City's position that the ground floor portion of the Premises must be used for retail purposes and cannot be used for general offices. . . .
>
> It is, therefore, beyond question that you have failed to comply with the requirements of the Lease for the Delivery Date and, therefore, the Lease Commencement Date, to have occurred.
>
> Accordingly, pursuant to Section 2.3 of the Lease, we hereby terminate the Lease, effective immediately.  Please promptly return any rent, additional rent or security.

*Id*.

Match Group maintains that there was no resolution of the issue regarding retail use on the ground floor of the subject property until June 4, 2019.  Specifically, Match Group says that following an undisclosed threat of litigation by KJ-Park against the City, the City Council convened a Special Meeting on June 3, 2019.  *See* Dkt. No. 97-1, ¶ 14, Ex. 13 at ECF 2.  The City Council went into a closed session at 11:45 p.m. and returned at 12:10 a.m. on June 4, 2019, the

1   results of which are documented in the City Council's minutes as follows:

2

3       Mayor Filseth announced the Council voted 6-1 (Council Member
        Kou dissenting) to approve an agreement between the City and the
        property owner at 2555 Park Boulevard to resolve a potential
4       lawsuit with an agreement that retail use shall not be required on the
        ground floor of the building at 2555 Park Boulevard and that the
5       office use on the ground floor shall be considered a legal
        nonconforming use.

6   *Id.* at ECF 10.  KJ-Park and the City also entered into a Settlement and Mutual Release Agreement

7   "to avoid the cost, difficulty and uncertainty of litigation and to finally settle and resolve their

8   disagreements regarding the application of Ordinance 5358 to the [subject property]."  Dkt. No.

9   97-1 ¶ 5, Ex. 4 at ECF 3.  The settlement agreement states the City's agreement "that retail use

10  shall not be required on the ground floor of the Project, and that the office use on the ground floor

11  of the Project shall be considered a legal nonconforming use, subject to the provision of Palo Alto

12  Municipal code Chapter 18.70, as if established prior to the effective date of Ordinance 5358."  *Id.*

13  The settlement agreement further states that the City "agrees to review and process the application

14  for tenant improvements at the Project promptly following full execution of this Agreement."  *Id.*

15  But, as discussed above, Match Group claims that it had already terminated the Lease on May 30,

16  2019.  Dkt. No. 97-1 ¶ 18, Ex. 17.

17          On March 23, 2023, K-J Park filed the present lawsuit against Match Group in the Santa

18  Clara County Superior Court, claiming that Match Group breached the Lease and Guaranty.  Dkt.

19  No. 1-2.  Match Group removed the action to this Court, asserting federal diversity jurisdiction, 28

20  U.S.C. § 1332.  *See* Dkt. No. 1; *see also* Dkt. Nos. 22, 22-1.  Following KJ-Park's sale of the

21  subject property in October 2023, the Court gave KJ-Park leave to file an amended complaint to

22  lower the amount of its claimed damages.[4]  Dkt. No. 70.  KJ-Park's operative first amended

23  complaint seeks at least $6,986,605, plus "unpaid additional rent in an amount to be proven,"

24  interest, attorneys' fees, and costs.  Dkt. No. 72.  In their answer, defendants assert affirmative

25  defenses based on unilateral mistake (third affirmative defense), mutual mistake (fourth

26

27  _____

    [4] The Court denied KJ-Park's request to amend its complaint to add a claim for breach of the
28  implied covenant of good faith and fair dealing.  Dkt. No. 70.

affirmative defense), fraud in the inducement (sixth affirmative defense), illegal purpose (seventh affirmative defense), and frustration of purpose (eleventh affirmative defense).  Dkt. No. 76. Additionally, Match Group, LLC asserts counterclaims for breach of contract and for monies had and received, claiming that KJ-Park owes Match Group, LLC more than $300,000, representing amounts that Match Group, LLC paid for rent, expenses, vendor costs, and security regarding the subject property.  *Id*.

KJ-Park now moves for partial summary judgment on its claims[5] and on Match Group's affirmative defenses of mistake, fraud in the inducement, illegal purpose, and frustration of purpose.  Match Group moves for summary judgment on KJ-Park's claims for breach of contract and breach of guaranty, as well on Match Group's affirmative defenses of mistake and frustration of purpose, and Match Group, LLC's counterclaims for breach of contract and for monies had and received.

## II.    LEGAL STANDARD

A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986).  The moving party bears the initial burden of informing the court of the basis for the motion, and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits which demonstrate the absence of a triable issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  In order to meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc*., 210 F.3d 1099, 1102 (9th Cir. 2000).

If the moving party meets its initial burden, the burden shifts to the non-moving party to produce evidence supporting its claims or defenses.  *See id*. at 1102.  The non-moving party may

---

[5] Although it maintains that it complied with all of its contractual obligations, KJ-Park does not seek summary judgment on issues relating to "Delivery Condition" and whether KJ-Park timely delivered possession of the premises to Match Group.  *See* Dkt. No. 100 at 13 n.2.

1    not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce

2    admissible evidence that shows there is a genuine issue of material fact for trial. *See id*. A

3    genuine issue of fact is one that could reasonably be resolved in favor of either party. A dispute is

4    "material" only if it could affect the outcome of the suit under the governing law. *Anderson*, 477

5    U.S. at 248-49.

6    **III.    DISCUSSION**

7        **A.    KJ-Park's Motion for Partial Summary Judgment**[6]

8        KJ-Park contends that it constructed the base, shell, and core of the building in compliance

9    with all applicable laws, to the extent necessary for Match Group to be able to use the entire

10   building for general office use on all three floors. As such, KJ-Park argues that Match Group had

11   no basis to terminate the Lease, and that Match Group's affirmative defenses based on mistake,

12   fraud in the inducement, illegal purpose, and frustration of purpose fail as a matter of law. KJ-

13   Park's principal contention is that it obtained a common law vested right to use the entire building

14   for an office (with no retail) well before the parties entered into the Lease. *See* Dkt. No. 100 at 13.

15           **1.    Vested Rights Doctrine**

16       KJ-Park has not demonstrated that the vested rights doctrine is relevant to delineate the

17   parties' respective contractual rights and obligations under the Lease. Rather, caselaw indicates

18   that the doctrine is one that addresses legal rights and obligations as between KJ-Park and the

19   City.

20       Under the vested rights doctrine, "if a property owner has performed substantial work and

21   incurred substantial liabilities in good faith reliance upon a permit issued by the government, he

22   acquires a vested right to complete construction in accordance with the terms of the permit." *Avco*

23   *Cmty. Developers, Inc. v. S. Coast Reg'l Comm'n*, 17 Cal. 3d 785, 791 (1976). The doctrine "is

24   grounded upon the constitutional principle that property may not be taken without due process of

25

26   _____

27   [6] Match Group objects to certain statements made by Mr. Minkoff and Mr. Fong in their respective declarations submitted in support of KJ-Park's partial summary judgment motion. *See* Dkt. No. 106 at 25. The Court finds it unnecessary to consider those particular statements in

28   resolving KJ-Park's motion. Accordingly, Match Group's evidentiary objections are deemed moot.

United States District Court
Northern District of California

law," *Russ Bldg. P'ship v. City & Cnty. of San Francisco*, 44 Cal. 3d 839, 846 (1988), as well as

"estoppel of the governing body," *Anderson v. City Council of City of Pleasant Hill*, 229 Cal. App.

2d 79, 89 (1964).  "The doctrine of vested rights is ordinarily applied when a local agency

attempts to prevent the completion or use of a project on the grounds that the project, while lawful

at the time a permit was issued, had been rendered unlawful by an intervening change in the law."

*Attard v. Bd. of Supervisors of Contra Costa Cnty.*, 14 Cal. App. 5th 1066, 1076 (2017).  Thus,

"[o]nce a landowner has secured a vested right the government may not, by virtue of a change in

the zoning laws, prohibit construction authorized by the permit upon which he relied."  *Avco*, 17

Cal. 3d at 791.

     As KJ-Park acknowledged at the motion hearing (*see* Dkt. No. 122 at 35:23-36:6), there is

no precedent for invoking the vested rights doctrine in these circumstances against a *private entity*

based on the alleged misconduct or mistake by a *government entity*.  KJ-Park's theory of liability

as to Match Group for breach of the parties' Lease and Guaranty rests principally, if not entirely,

on the *City*'s alleged misapplication of the Ordinance to bar or delay Match Group, LLC's tenant

improvement plan which contemplated use of the subject property as office space on all three

floors of the building, contrary to KJ-Park's alleged vested rights.  *See, e.g.,* Dkt. No. 102 ¶ 21,

Ex. 8 (KJ-Park correspondence with Match Group stating KJ-Park's views regarding "erroneous

statement" by City employee and "delay caused solely and erroneously by the City of Palo Alto.").

However, the correctness of the City's application of the Ordinance to the subject property was

disputed as between KJ-Park and the *City*.  There is no indication that the resolution of that

dispute was within Match Group's control.  KJ-Park points out that its correspondence with Match

Group noted general progress in discussions with the City, and that Match Group's own internal

documents indicate that there was "[h]ope[] for decision from [the] City post Memorial Day

w[ee]k[en]d."  *See* Dkt. No. 110 ¶ 30, Ex. 21 at ECF 3; Dkt. No. 116 ¶¶ 3-5 & Ex. A at ECF 6, Ex.

B (Fong Dep. at 185:16-187:23), Ex. C.  But nothing in the record states that KJ-Park and the City

would resolve their dispute by a date certain, or indicates that Match Group knew that a resolution

would ultimately be reached on June 4, 2019.

     Even accepting KJ-Park's assertion that the vested rights doctrine may be a lens through

13

United States District Court
Northern District of California

which to view the parties' rights and obligations under the Lease, KJ-Park has not established that it obtained a vested right to use of the building as office space on all three floors, by virtue of the June 1, 2015 RLUA.  While "[i]t is beyond question that a landowner has no vested right in existing or anticipated zoning," *Avco*, 17 Cal. 3d at 796, KJ-Park contends that, because the prior property owner obtained the RLUA before the enactment of the Ordinance, when KJ-Park subsequently purchased the property (more than eight months after the Ordinance was in effect), KJ-Park obtained a vested right to construct and use the proposed building consistent with prior zoning laws in effect at the time the RLUA issued.  Although KJ-Park acknowledges that cases generally recognize a building permit as the prerequisite for a vested rights claim, KJ-Park argues that in *Avco*, "the California Supreme Court has acknowledged that a landowner may obtain a vested right through a separate form of authorization, which provides substantially the same specific description of the project and necessary discretionary approvals."  Dkt. No. 100 at 14-15. KJ-Park argues that the June 1, 2015 RLUA was "a 'functional equivalent' to a building permit," inasmuch as the RLUA was based on detailed architectural drawings, reports, and presentations showing office space on the ground floor, as well as on what KJ-Park says was a rigorous review by the Architectural Review Board, and eventually by the City Council.  *See* Dkt. No. 100 at 16; Dkt. No. 101 ¶¶ 8-9, Exs. F & G.

In *Avco*, the California Supreme Court concluded that under the particular circumstances presented, a grading permit was not sufficient to create a vested right to develop property where a building permit was required, but the property owner failed to obtain one.  *Avco*, 17 Cal. 3d at 791-97.  Although the *Avco* decision was expressly not based on "an obdurate adherence to archaic concepts inappropriate in the context of modern development practices or upon a blind insistence on an instrument entitled 'building permit,'" the California Supreme Court did not definitively recognize an exception to the building permit rule.  *See Avco*, 17 Cal. 3d at 797. Rather, *Avco* left open the question of whether some other type of permit, if sufficiently specific, could form an appropriate basis for a vested rights claim.  *See id.* at 793-94, 797.  Indeed, the *Avco* court cautioned that if it were to expand the scope of permits on which developers could rely, "there could be serious impairment of the government's right to control land use policy."  *Id.* at

797.

KJ-Park does not cite any authority recognizing that an RLUA is the equivalent of a building permit for purposes of establishing a vested rights claim. Moreover, the undisputed evidence—including the terms of the RLUA and the Ordinance themselves—indicates that the June 1, 2015 RLUA was not the final exercise of the City's authority over the project, much less the hallmark of the City's final approval for *use* of the proposed building, which had not yet been constructed. While Mr. Lait testified in deposition that the RLUA was the last discretionary approval required for "the building shell and design," the RLUA itself required KJ-Park to apply for a building permit. *See* Dkt. No. 101 ¶ 3, Ex. A (Lait Dep. at 48:9-12, 17-23); Dkt. No. 101 ¶ 9, Ex. G at 9; *see also Consaul v. City of San Diego*, 6 Cal. App. 4th 1781, 1798-99 (1992) (where the relevant legal procedure "provides that further action, i.e., application for a building permit, is required . . . [i]t makes no difference that building permit approval is normally considered a ministerial process . . . .."). The RLUA required that KJ-Park's permit application should not only be "in substantial conformance with plans received on October 16, 2014," but should also be modified to include the RLUA's conditions of approval "*and any additional conditions placed on the project by the Planning Commission, Architectural Review Board, or City Council*." *See* Dkt. No. 101 ¶ 9, Ex. G at ECF 9 (emphasis added). The RLUA also included "Additional Conditions" and "Standard Conditions" that "[t]he approved use and/or construction are subject to, and shall comply with, all applicable City ordinances and laws and regulations of other governmental agencies." *See id*. at ECF 32, 34; *see also Aries Dev. Co. v. Cal. Coastal Zone Conservation Comm'n*, 48 Cal. App. 3d 534, 546 (1975) ("So long as the City retained discretion to approve or disapprove the project, prior approval of the tentative map and site plan was not the final exercise of the City's authority over the project."). Additionally, in deposition Mr. Lait drew a distinction between the "architectural entitlement" approved by the RLUA, which concerned "the mass, the size, [and] the scale" of the building, and the land uses for the proposed building, which "would be subject to the permitted land uses of the zoning code." *See* Dkt. No. 106-1 ¶ 9, Ex. 8 (Lait Dep. at 53:23-54:5). KJ-Park's citation to *San Clemente Estates v. City of San Clemente*, 12 B.R. 209 (1981) does not compel a different analysis. *See San Clemente Estates*, 12 B.R. at 217

1  (concluding that debtor had vested right to complete construction of subdivision based on, among

2  other things, reliance on a use permit and recordation of a final tract map).

3          Further, the undisputed evidence demonstrates that KJ-Park did not commence

4  construction or perform substantial work in reliance on any building permit before the November

5  2015 effective date of the Ordinance.  Indeed, KJ-Park did not acquire the subject property until

6  more than eight months after the Ordinance went into effect.  Dkt. No. 102 ¶ 2.  KJ-Park did not

7  obtain the requisite building permit until January 2017, more than a year after the Ordinance went

8  into effect.  *Id*. ¶ 9, Ex. 6.  This sequence of events is significant because "neither the existence of

9  a particular zoning nor work undertaken pursuant to governmental approvals preparatory to

10  construction of buildings can form the basis of a vested right to build a structure which does not

11  comply with the laws applicable *at the time a building permit is issued*."  *Avco*, 17 Cal. 3d at 793

12  (emphasis added).  "Following *Avco*, it is generally recognized that while the issuance of a permit

13  may insulate a party against subsequent changes in the law, it cannot create a vested right to

14  construct or use property in violation of laws in effect *at the time of issuance of the permit*."

15  *Attard*, 14 Cal. App. 5th at 1077 (emphasis added).  Additionally, the building permit itself says

16  nothing about allowing office space on all three floors of the proposed building.  Rather, the

17  permit is for a "N[ew] W[arm] S[hell] F[or] T[hree] S[tory] C[ommercial] 23,853 S[quare] F[oot]

18  B[uilding], A[nd] B[elow] G[rade] P[arking] S[tructure]."  *Id*.; Dkt. No. 102-6.  As Mr. Reich's

19  uncontradicted testimony demonstrates , a "warm shell" refers to a "building without the interior

20  tenant spaces built out" and no "specific occupancy."  Dkt. No. 106-1 ¶ 10, Ex. 9 (Reich Dep. at

21  104:15-21).

22          Nor is KJ-Park aided by the February 2017 email communications with City staff,

23  indicating that Mr. Lait did not feel that requiring retail use on the ground floor of the subject

24  premises would be reasonable.  *See* Dkt. No. 101 ¶ 12, Ex. J at ECF 2; *see also* Dkt. No. 101 ¶ 3,

25  Ex. A (Lait Dep. at 82:18-23); Dkt. No. 101 ¶ 5, Ex. C (Reich Dep. at 65:5-21).  There is no

26  evidence that either Mr. Lait, or any other individual City employee or official, had the authority

27  to make that determination.  Other than a grandfathering provision that indisputably does not

28  encompass the subject property, the Ordinance itself provides that a request for "waiver or

United States District Court
Northern District of California

16

1    adjustment" of the Ordinance requires action by the City Council.  Dkt. No. 97-1 ¶ 4, Ex. 3 at 6.

2           While the parties argue at length about the proper interpretation of the settlement

3    agreement between KJ-Park and the City, and what the settlement agreement purportedly signifies

4    with respect to the City's position on matters at issue here, that settlement agreement is irrelevant

5    to the existence of KJ-Park's claimed vested right to use the subject building exclusively as an

6    office.  Indeed, the settlement agreement itself states that "neither [KJ-Park nor the City] admits

7    any fault or wrongdoing, nor concedes that the legal or factual positions taken by the other Party

8    in this matter were correct."  Dkt. No. 101 ¶ 16, Ex. N at ECF 3.  Even if the settlement agreement

9    were interpreted, contrary to this express language, as a concession that either KJ-Park or the City

10   was wrong, it would not matter for purposes of resolving the present motion for summary

11   judgment, as the City could not agree to the correctness of any legal conclusions in the present

12   proceedings.

13          Arguing that "'there is no meaningful distinction between an estoppel claim and a vested

14   right claim where land use is at issue,'" Dkt. No. 100 at 14 (quoting *Toigo v. Town of Ross*, 70

15   Cal. App. 4th 309, 321 (1998), KJ-Park maintains that principles of equitable estoppel support the

16   existence of its alleged vested right to use the subject building as an office, with no retail.  Here,

17   KJ-Park argues that following the issuance of the RLUA in 2015, the City could have enforced the

18   Ordinance with respect to the subject property.  Instead, KJ-Park says, the City continued to give

19   approvals regarding the project, including by issuing a building permit and approving a

20   subsequent modification to the building's façade, without stating or suggesting that KJ-Park could

21   not build and use all three floors of the building as office space, without retail.  *See* Dkt. No. 100

22   at 16-19; Dkt. No. 114 at 9-10; Dkt. No. 102 ¶¶ 8, 9, 12, Exs. 4-7.  However, the only relevant

23   actor for purposes of applying an estoppel in these circumstances is the *City*.  *See Attard*, 14 Cal.

24   App. 5th at 1079 ("The elements of the doctrine are that (1) the party to be estopped must be

25   apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that

26   the party asserting the estoppel has a right to believe it was so intended; (3) the other party must be

27   ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury.").  At the

28   motion hearing, KJ-Park clarified that it is not seeking an estoppel *remedy* against Match Group.

United States District Court
Northern District of California

*See* Dkt. No. 122 at 37.  Emphasizing that the estoppel doctrine is based on concepts of equity and fair dealing, *see Raley v. Cal. Tahoe Reg'l Planning Agency,* 68 Cal. App. 3d 965, 975 (1977), and asserting that Match Group had at least constructive notice of the Ordinance when the parties entered the Lease, KJ-Park maintains that estoppel applies here to prevent what it contends is the unjust result of permitting Match Group to terminate the Lease based on the assertion that KJ-Park was not in compliance with all laws.  *See* Dkt. No. 100 at 16-19; Dkt. No. 114 at 9-10; Dkt. No. 122 at 37-38.  KJ-Park's position remains problematic because KJ-Park is using the rationale underlying the estoppel doctrine as a legal *theory* to hold Match Group liable for the *City's* conduct.  KJ-Park's thesis is that because the City *should have been estopped* from applying the Ordinance to the property, KJ-Park was in compliance with all laws, and Match Group did not have a right to terminate the Lease.  Proper application of estoppel principles in this context requires that Match Group be estopped from terminating the Lease based on *Match Group's own conduct*, and not based on the City's conduct, as to which there is no argument, evidence, or suggestion that Match Group had any control.

KJ-Park is not aided by its reliance on *Congregation ETZ Chaim v. City of Los Angel*es, 371 F.3d 1122 (9th Cir. 2004).  In *Congregation ETZ Chaim*, the Ninth Circuit concluded that the plaintiff-congregation was entitled to equitably estop the defendant-city from revoking a building permit, in view of the parties' litigation history, a prior settlement agreement, and the defendant-*city*'s post-settlement conduct.  *Congregation ETZ Chaim*, 371 F.3d at 1124-25.  Here, by contrast, KJ-Park contends that Match Group was equitably estopped from terminating the Lease because the City was wrong to have raised the Ordinance as a possible obstacle to Match Group's tenant improvement plans.  The principle of equitable estoppel does not work this way; it is not a catch-all doctrine that can be invoked to rectify a result a party believes is unfair.  *See Attard*, 14 Cal. App. 5th at 1079-81 (declining to apply equitable estoppel where government entity mistakenly issued a permit, contrary to law, even though plaintiff had invested over $550,000 in reliance on the permit).

KJ-Park's motion for partial summary judgment based on its claimed "vested legal right" to use the entire three-story building as an office is denied.

United States District Court
Northern District of California

United States District Court
Northern District of California

2.      **Match Group's Third and Fourth Affirmative Defenses:  Mistake**

Match Group's third and fourth affirmative defenses are based on unilateral mistake and mutual mistake, respectively.  Dkt. No. 76.  KJ-Park maintains that these affirmative defenses fail as a matter of law because "KJ-Park obtained a vested right to use the entire Property for office use, with no retail requirement."  *See* Dkt. No. 100 at 22; *see also* Dkt. No. 114 at 15.  KJ-Park's motion is denied for the reasons discussed above.

3.      **Match Group's Sixth Affirmative Defense:  Fraud in the Inducement**

Match Group's sixth affirmative defense alleges that KJ-Park "fraudulently induced [Match Group] to enter into the Lease and the Lease Guaranty while [KJ-Park] represented to [Match Group] that Match Group, LLC could lawfully use the entire premises for offices, when [KJ-Park] knew that the City of Palo Alto had not granted the necessary approval or permit(s) for the ground floor of the premises to be used for anything other than retail."  Dkt. No. 76 at 8. Match Group further alleges that KJ-Park "made such false representations to [Match Group] with actual knowledge and/or reckless disregard as to the truth of its representations, and with the intent to induce Match Group, LLC to enter into the Lease and induce Match Group, Inc. to sign the Lease Guaranty."  *Id*.

To the extent KJ-Park's summary judgment motion regarding Match Group's affirmative defense of fraud in the inducement is based on the contention that KJ-Park had vested rights to use the premises as office space on all three floors (with no retail), KJ-Park 's motion for summary judgment is denied for the reasons stated above.

KJ-Park also contends that it is entitled to summary judgment on this affirmative defense because there is no evidence that it intentionally misled Match Group when negotiating the Lease. *See Food Safety Net Servs. v. Eco Safe Sys. USA, Inc*., 209 Cal. App. 4th 1118, 1131 (2012) ("To establish a claim of fraudulent inducement, one must show that the defendant did not intend to honor its contractual promises when they were made.").  Here, KJ-Park maintains that Match Group cannot produce evidence of such intent, arguing that "undisputed evidence demonstrates that KJ-Park received multiple assurances and approvals from the City indicating that it could use all three floors of the Building for Office." *See* Dkt. No. 100 at 23.  Although Match Group bears

19

United States District Court
Northern District of California

the burden of proof on this affirmative defense, it has not addressed KJ-Park's arguments.  Match Group instead refers the Court to defendants' motion for summary judgment, which also does not address their affirmative defense based on fraud in the inducement.  *See* Dkt. No. 106 at 22-25; *see also generally* Dkt. Nos. 97, 113.  Elsewhere in its opposition papers (in connection with arguments concerning other affirmative defenses), Match Group points to evidence that KJ-Park was aware of the Ordinance before it purchased the subject property in 2016.  *See* Dkt. No. 106 at 23 (citing Dkt. No. 97-1 ¶ 19, Ex. 18 at ECF 2-3).  Although Match Group asserts that KJ-Park withheld information about the Ordinance, Match Group cites only to Mr. Fong's deposition testimony that he could not recall, one way or the other, if KJ-Park informed Match Group about the Ordinance during contract negotiations.  *See id*. (citing Dkt. No. 97-1 ¶ 9, Ex. 8 (Fong Dep. at 90:12-18; 91:1-4)).  Match Group also asserts that KJ-Park demonstrated a lack of candor in its dealings with defendants, asserting that certain other evidence shows that in April 2019 KJ-Park backdated an AIA Form G704 Certificate of Substantial Completion.  *See id*. at 13; Dkt. No. 106-1 ¶¶ 5, 6, Exs. 4, 5.  Match Group has not persuasively demonstrated or articulated how this evidence creates a genuine dispute of material fact regarding KJ-Park's fraudulent intent at the time the parties entered the Lease.

KJ-Park's motion for summary judgment on Match Group's sixth affirmative defense based on fraud in the inducement is granted.

### 4.     Match Group's Seventh Affirmative Defense:  Illegal Purpose

Match Group's seventh affirmative defense alleges that "the subject Lease is unenforceable because at all relevant times, the terms relating to [Match Group's] intended exclusive use of the subject building as office space violated the City of Palo Alto's Retail Preservation Ordinance." Dkt. No. 76 at 8.  California law defines "[u]nlawfulness" as that which is "[c]ontrary to an express provision of law"; "[c]ontrary to the policy of express law, though not expressly prohibited"; or "[o]therwise contrary to good morals."  Cal. Civ. Code § 1667.

KJ-Park argues that it is entitled to summary judgment on Match Group's affirmative defense of illegal purpose, based on the contention that KJ-Park had vested rights to use the premises as office space on all three floors (with no retail).  For the reasons stated above, KJ-

1   Park's motion for summary judgment as to Match Group's seventh affirmative defense is denied.

2        **5.    Match Group's Eleventh Affirmative Defense:  Frustration of Purpose**

3        Match Group's eleventh affirmative defense alleges that "the express purpose of the Lease

4   was frustrated by the position that was taken by the City of Palo Alto up until [June] 4, 2019, that

5   the ground floor of the premises which were the subject of the Lease had to be used for retail

6   purposes, and that the Lease is therefore unenforceable on that basis."  Dkt. No. 76 at 9.

7        "A contract must be so interpreted as to give effect to the mutual intention of the parties as

8   it existed at the time of contracting, so far as the same is ascertainable and lawful."  Cal. Civ. Code

9   § 1636.  "The doctrine of frustration excuses contractual obligations where performance remains

10  entirely possible, but the whole value of the performance to one of the parties at least, and the

11  basic reason recognized as such by both parties, for entering into the contract has been destroyed

12  by a supervening and unforeseen event."  *SVAP III Poway Crossings, LLC v. Fitness Int'l, LLC*,

13  87 Cal. App. 5th 882, 895 (2023) (cleaned up); *see also Habitat Trust for Wildlife, Inc. v. City of*

14  *Rancho Cucamonga*, 175 Cal. App. 4th 1306, 1336 (2009) ("[W]here performance remains

15  possible, but the reason the parties entered the agreement has been frustrated by a supervening

16  circumstance that was not anticipated, such that the value of performance by the party standing on

17  the contract is substantially destroyed, the doctrine of commercial frustration applies to excuse

18  performance.").  "A party seeking to escape the obligations of its lease under the doctrine of

19  frustration must show: (1) the purpose of the contract that has been frustrated was contemplated by

20  *both* parties in entering the contract; (2) the risk of the event was not reasonably foreseeable and

21  the party claiming frustration did not assume the risk under the contract; and (3) the value of

22  counter-performance is totally or nearly totally destroyed."  *SVAP III Poway Crossings, LLC,* 87

23  Cal. App. 5th  at 895.  "Governmental acts that merely make performance unprofitable or more

24  difficult or expensive do not suffice to excuse a contractual obligation."  *Id.*

25        To the extent KJ-Park's summary judgment motion regarding Match Group's affirmative

26  defense of frustration of purpose is based on KJ-Park's contention that it had vested rights to use

27  the premises as office space on all three floors (with no retail), KJ-Park 's motion for summary

28  judgment is denied for the reasons stated above.

1    As an additional basis for its motion, KJ-Park contends that Match Group cannot show that

2    any delay in the City's approval for Match Group, LLC's occupancy and use of the subject

3    property as office space on all three floors was unforeseeable.  Noting that the Lease expressly

4    excluded retail use (*see* Dkt. No. 97-1 ¶ 2, Ex. 1 at ECF 14), Match Group contends that the

5    fundamental purpose of the Lease was to use the entire building as office space (with no retail).

6    Match Group argues that this purpose "was commercially frustrated by the Ordinance such that

7    Match Group LLC could not use the space for its contracted purpose" and "had no certainty that it

8    would ever be able to use the space for its contracted use."  Dkt. No. 106 at 24-25.

9    Match Group has not demonstrated that the doctrine of commercial frustration fits the

10   particular facts presented here.  The Lease provided Match Group with a *discretionary* right to

11   terminate the contract; Match Group was not obliged to terminate the Lease when it did.  Dkt. No.

12   97-1 ¶ 2, Ex. 1 at ECF 8.  Additionally, the Ordinance had been in effect for nearly three years

13   before the parties entered the Lease (*see* Dkt. No. 97-1 ¶ 4, Ex. 3), and the undisputed facts

14   indicate that at least two floors of the building remained available for Match Group's use.  Match

15   Group has not persuasively argued or demonstrated that the Ordinance itself was a "supervening

16   and unforeseen event," or that the facts show that the value of the Lease was "substantially" or

17   "totally or nearly totally destroyed."  *See SVAP III Poway Crossings, LLC*, 87 Cal. App. 5th at

18   895; *see also Habitat Tr. for Wildlife, Inc.* 175 Cal. App. 4th at 1336.

19   KJ-Park's motion for summary judgment on Match Group's eleventh affirmative defense

20   based on frustration of purpose is granted.

21   **B.    Match Group's Motion for Summary Judgment**

22   Match Group moves for summary judgment on KJ-Park's claims for breach of contract and

23   breach of guaranty, as well on as Match Group, LLC's counterclaims for breach of contract and

24   for monies had and received, and Match Group's affirmative defenses of mistake and frustration

25   of purpose.

26   **1.    KJ-Park's Breach of Contract Claim**

27   To prevail on a claim for breach of contract, a plaintiff must show (1) the existence of a

28   contract with defendants, (2) plaintiff's performance or excuse for nonperformance,

United States District Court
Northern District of California

(3) defendants' breach, and (4) resulting damages to plaintiff.  *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011).  Match Group contends that it is entitled to summary judgment on KJ-Park's contract claim on the ground that KJ-Park failed to provide the premises "in compliance with Applicable Law (to the extent necessary for Tenant to obtain and retain a certificate of occupancy or its legal equivalent for the Premises for general office use)."  *See* Dkt. No. 97 at 5; Dkt. No. 97-1 ¶ 2, Ex. 1 at ECF 8, 52.  Match Group maintains that in view of the Ordinance, the subject building could not have been legally used for "general office use" on all three floors until June 4, 2019 (at the earliest) when the City Council returned from its closed session and resolved questions concerning application of the Ordinance to the subject property.  *See* Dkt. No. 97-1, ¶ 14, Ex. 13 at ECF 10.  Match Group argues that the "Delivery Date," as defined in the Lease, therefore could not have occurred until after the March 1, 2019 deadline that triggered defendants' termination rights under the Lease.  As such, Match Group contends that it properly terminated the Lease pursuant to section 2.3 of the Lease.  KJ-Park maintains that Match Group's termination was invalid and premature and that Match Group therefore breached the Lease.  Arguing that it did construct the "Base, Shell, and Core" of the building "in compliance with Applicable Law," KJ-Park disputes Match Group's position that "delivery never timely occurred," and that the "Delivery Date" could not have occurred any earlier than June 4, 2019.  *See* Dkt. No. 107 at 6.

KJ-Park's opposition rests primarily on its alleged vested legal right to use of the building as office space on all three floors (with no retail).  *See id*. at 6-9.  For the reasons discussed above in connection with KJ-Park's motion for partial summary judgment, KJ-Park's alleged vested legal right does not preclude summary judgment for Match Group on the breach of contract claim.

At the motion hearing, KJ-Park conceded that if the Court found no vested legal right, then there would be nothing left to try with respect to KJ-Park's claims regarding breach of the Lease and breach of the Guaranty.  *See* Dkt. No. 122 at 6 ("T[he] C[ourt]:  And if I find there is no vested legal right, then are we done from KJ-Park's perspective or is there still an argument that KJ-Park has that the lease was breach[ed] or the guaran[ty] was breached?  M[s]. B[ellafronto]: 'Yeah.  I think that—. . . we would concede that that would put the issue to rest, that we would be done.").

1    Additionally, of material significance here is the fact that no one disputes that section 2.3

2    of the Lease identifies March 1, 2019 as the date that triggered Match Group's right to terminate

3    the Lease "if the Delivery Date shall not occur on or before" that date.  *See* Dkt. No. 97-1 ¶ 2, Ex.

4    1 at ECF 8; *see also* Dkt. No. 97 at 15; Dkt. No. 107 at 5 n.1.  KJ-Park disputes Match Group's

5    position that the "Delivery Date" could not have occurred before June 4, 2019.  KJ-Park devotes

6    much of its briefing to arguments about the relevance and proper interpretation of the settlement

7    agreement between KJ-Park and the City, and the legal import of the City Council's June 3, 2019

8    closed session.  *See* Dkt. No. 107 at 9-16.  However, KJ-Park has not presented evidence or

9    argument demonstrating (or at least raising a triable question) that the "Delivery Date" occurred

10   on or before the March 1, 2019 trigger date for Match Group's termination rights.

11       Accordingly, Match Group's motion for summary judgment on KJ-Park's claim for breach

12   of the Lease is granted.

13                    **2.    KJ-Park's Breach of Guaranty Claim**

14       As Match Group is entitled to summary judgment on KJ-Park's claim for breach of the

15   Lease, the Court also grants Match Group's motion for summary judgment on KJ-Park's claim for

16   breach of the Guaranty.  *See Gerristen v. Warner Bros. Entm't, Inc.*, 112 F. Supp. 3d 1011, 1035

17   (C.D. Cal. 2015) ("California courts apply the same [breach of contract] legal standard to breach

18   of guaranty claims."); *Harrison Ventures, LLC v. Alta Mira Treatment Ctr., LLC*, No. C10-00188

19   RS, 2010 WL 1929566, at *5 (N.D. Cal. May 12, 2010) (dismissing claim for breach of guaranty

20   that depended upon a claim for breach of contract, where plaintiff failed to state sufficient facts

21   supporting breach of underlying contract); Cal. Civ. Code §§ 2787, 2809, 2810; *see also* Dkt. No.

22   122 at 6.

23                **3.    Match Group's Third and Fourth Affirmative Defenses:  Mistake**

24       Match Group's third affirmative defense alleges that KJ-Park's claims for breach of the

25   Lease and of the Guaranty are barred by unilateral mistake "because [KJ-Park] [led] [Match

26   Group] to believe, and [Match Group] w[as] under the mistaken impression, that [Match Group]

27   could use the entirety of the premises that were the subject of the Lease for offices."  Dkt. No. 76

28   at 6.  Match Group further alleges that KJ-Park "knew or should have known that [Match Group]

United States District Court
Northern District of California

1   w[as] under the mistaken impression that they could lawfully use the entirety of the Premises for

2   offices, and [KJ-Park] took advantage of it." *Id*. at 7.  Match Group contends that "Match group,

3   Inc. would not have signed the Lease Guaranty if [it] had known that Match Group, LLC could not

4   lawfully use the entire premises exclusively as office space." *Id*.

5        Match Group's fourth affirmative defense is based on mutual mistake and alleges that

6   "both [KJ-Park] and [Match Group] were under the mistaken impression when they entered into

7   the Lease that [d]efendants could use the entirety of the premises that were the subject of the

8   Lease for offices." *Id*.  Match Group further alleges that "[n]either party was aware at the time

9   they entered into the Lease that the City of Palo Alto took the position that the City's Retail

10  Preservation Ordinance precluded [d]efendants from lawfully using the ground floor of the

11  Premises for offices." *Id*.  Match Group contends that "neither party would not have entered into

12  the Lease, and Match Group, Inc. would not have signed the Lease Guaranty, if [it] had known

13  that Match Group, LLC could not lawfully use the entire premises exclusively as office space."

14  *Id*.

15       Separate and apart from the issue of whether Match Group properly terminated the Lease,

16  Match Group moves for summary judgment principally upon its third affirmative defense based on

17  unilateral mistake.  Match Group moves, in the alternative, for summary judgment on defendants'

18  fourth affirmative defense based on mutual mistake.  Dkt. No. 97 at 17-19.  Match Group contends

19  that at the time the parties entered the Lease, Match Group was unaware of the "Ordinance and its

20  application" to the subject property, and that this was a unilateral "mistaken fact in the context of

21  the Lease and Guarant[y]," in view of the Lease terms stating that KJ-Park would construct a

22  building "in compliance with Applicable Law" and expressly prohibiting "any retail or restaurant

23  use that serves the general public[.]"  Dkt. No. 97-1 ¶ 2, Ex. 1 at ECF 14, 52.

24       A party may rescind a contract if the rescinding party's consent to the contract was given

25  by mistake.  Cal. Civ. Code § 1689(b)(1); *Donovan v. RRL Corp.*, 26 Cal. 4th 261, 278 (2001).  A

26  mistake may either be one of fact or law.  A mistake of fact is "a mistake, not caused by the

27  neglect of a legal duty on the part of the person making the mistake," and consists of (1) "[a]n

28  unconscious ignorance or forgetfulness of a fact past or present, material to the contract" or

United States District Court
Northern District of California

25

1   (2) [b]elief in the present existence of a thing material to the contract, which does not exist, or in

2   the past existence of such a thing, which has not existed."  Cal. Civ. Code § 1577.  "'A mistake of

3   law is when a person knows the facts as they really are, but has a mistaken belief as to the legal

4   consequences of those facts.'"  *Estate of Eskra*, 78 Cal. App. 5th 209, 221-22 (2022) (quoting

5   *Hedging Concepts, Inc. v. First Alliance Mortgage Co.*, 41 Cal. App. 4th 1410, 1421 (1996)).  A

6   mistake of law "constitutes a mistake, within the meaning of [California law] only when it arises

7   from" (1) "[a] misapprehension of the law by all parties, all supposing that they knew and

8   understood it, and all making substantially the same mistake as to the law" or (2) "[a]

9   misapprehension of the law by one party, of which the others are aware at the time of contracting,

10  but which they do not rectify."  Cal. Civ. Code § 1578.

11        To the extent KJ-Park relies on its alleged "vested legal right" to use the entire building as

12  office space (with no retail), that contention does not preclude summary judgment for Match

13  Group on its affirmative defense of mistake.

14        Regardless of whether Match Group's claimed mistake is labeled one of fact or law, the

15  record before the Court is not sufficiently developed for the Court to determine whether Match

16  Group is entitled to summary judgment.  The parties' briefing does not clarify matters.  Match

17  Group essentially contends that at the time of the parties' contract negotiations, it did not know

18  about the Ordinance; KJ-Park was aware of the Ordinance; the Lease prohibited retail use; and in

19  deposition Mr. Fong could not recall one way or the other whether KJ-Park informed Match

20  Group about the Ordinance.  *See* Dkt. No. 97-1 ¶¶ 6, 9, 19, Ex. 5 (Perez Dep. at 83:19-21, 84:6-7);

21  Ex. 8 (Fong Dep. at 90:12-18; 91:1-4)); Ex. 18.  The record suggests that there are material

22  disputes about what mistakes may have been made, and by whom; whether KJ-Park knew about

23  Match Group's claimed mistake; and whether the parties may have made different mistakes of fact

24  and/or law.

25        Match Group's motion for summary judgment on its affirmative defenses of unilateral and

26  mutual mistake is denied.

27            **4.    Match Group's Eleventh Affirmative Defense:  Frustration of Purpose**

28  For the reasons discussed above in connection with KJ-Park's motion for partial summary

United States District Court
Northern District of California

1    judgment, Match Group's motion for summary judgment on its eleventh affirmative defense based

2    on frustration of purpose is denied.

3    **5.    Match Group, LLC's Counterclaims**

4    Match Group, LLC's counterclaim for breach of contract essentially alleges that KJ-Park

5    failed to deliver the premises in the condition required under the Lease, that Match Group properly

6    terminated the Lease, and that section 2.3 of the Lease requires KJ-Park to return $300,000, as

7    well as "any additional rent or security," Match Group says it paid to KJ-Park.  Dkt. No. 76 at 11-

8    12.

9    Match Group, LLC's related counterclaim for monies had and received alleges that KJ-

10   Park "is indebted to [Match Group, LLC] in a certain sum for money had and received by [KJ-

11   Park] for the use of Match Group, LLC—namely, all sums received from [Match Group, LLC] for

12   rent, expenses, vendor costs and security regarding subject Premises (which sums exceed

13   $300,000)."  *Id.* at 12.  Match Group, LLC further alleges that KJ-Park "never delivered the

14   subject Premises in the condition as was required under the Lease," and that KJ-Park "received

15   such sums from [Match Group, LLC] which in equity should be paid over to [Match Group,

16   LLC]."  *Id.*

17   For the reasons discussed above, Match Group is entitled to summary judgment that it

18   properly terminated the Lease pursuant to section 2.3 of the Lease.  Pursuant to section 2.3, upon

19   Match Group's termination of the Lease, the Lease "shall terminate, and Landlord and Tenant

20   shall have no further obligations or liabilities under the Lease (other than those stated in this Lease

21   to survive the expiration date) except Landlord shall promptly return to Tenant any rent, additional

22   rent or security paid by Tenant to Landlord."  Dkt. No. 97-1 ¶ 2, Ex. 1 a ECF 8.  KJ-Park has not

23   raised a triable issue of fact regarding whether, upon Match Group's May 30, 2019 termination of

24   the Lease, section 2.3 of the Lease requires KJ-Park to return "any rent, additional rent or security

25   paid by Tenant to Landlord."  However, the Court is unable to grant summary judgment for Match

26   Group, LLC on these counterclaims, inasmuch as Match Group, LLC has not submitted evidence

27   documenting the sums it claims to have paid to KJ-Park that KJ-Park reportedly has not returned

28   to Match Group, LLC, nor has Match Group, LLC clearly articulated where in the voluminous

United States District Court
Northern District of California

27

United States District Court
Northern District of California

1    record such evidence may be found.  *See* Dkt. No. 97 at 21 (requesting judgment "total[ing] at

2    least $300,000, since May 30, 2019.").

3           Accordingly, insofar as it appears that the sum of money claimed by Match Group, LLC

4    remains to be tried, Match Group's motion for summary judgment on its counterclaims is denied

5    to that extent.

6    **IV.    CONCLUSION**

7           Based on the foregoing, the Court grants in part and denies in part KJ-Park's motion for

8    partial summary judgment, and grants in part and denies in part Match Group's motion for

9    summary judgment.

10          **IT IS SO ORDERED.**

11   Dated: September 3, 2024

12
13                                                   Virginia K. DeMarchi
                                                     United States Magistrate Judge